IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

EMILY K. BARLOW,          }
                          }
     Plaintiff,           }
                          }     CIVIL ACTION NO.
v.                        }
                          }     2:14-CV-971-WMA
PIGGLY WIGGLY ALABAMA      }
DISTRIBUTING CO., INC., et }
al.,                      }
                          }
     Defendants.          }

**MEMORANDUM OPINION AND ORDER**

Before the court is the motion (Doc. 19) of defendants Piggly Wiggly Alabama Distributing Co., Inc. ("Piggly Wiggly"), and Louia Moseley ("Moseley") for partial summary judgment. For the reasons stated below, the motion will be denied.

**BACKGROUND**[1]

Plaintiff Emily K. Barlow ("Barlow") is a current employee of Piggly Wiggly in Bessemer, Alabama, and has worked for the company since 2005. (Docs. 21-1 at 10:7-8, 11:19-23, 21-2 at 8:8-10). She performs clerical work in the retailing department. (Doc. 21-1 at 11:8-16). Moseley worked for Piggly Wiggly from 1965 to 2013. (Doc. 21-2 at 8:4-5, 34:4-6). At all times pertinent to this suit he was the Senior Vice President of Management of Information Systems. (Doc. 21-2 at 10:18-19). He was one of three senior vice presidents

---

[1]The facts are presented in the light most favorable to Barlow, the non-movant. *Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002).

1

at Piggly Wiggly, and he was considered to be a corporate officer, reporting directly to Piggly Wiggly's president. (Docs. 21-2 at 10:22-11:15, 21-3 at 8:7-11).

Piggly Wiggly employs about 600 people. (Doc. 21-2 at 13:6-7). Only about fifteen of those employees reported directly to Moseley, but his work overseeing data processing and IT required him to interact with most other departments. (Doc. 21-2 at 12:12-14, 13:13-22). Moseley did not directly supervise Barlow, but Barlow reported to and interacted with Moseley regularly, on an almost daily basis. (Doc. 21-1 at 16:16-17:3). Before the incidents in question, the two were friends, willing to talk about personal issues. (Doc. 21-1 at 46:15-47:6).

Beginning in March 2010, during Moseley's visits to Barlow's office, he began making comments about how pretty her eyes were, and he would blow her kisses and look down at her breasts. He did this several times a week. (Doc. 21-1 at 15:3-7, 17:21-18:21). Moseley once walked into Barlow's office, kissed her on the forehead, and immediately walked out. (Doc. 21-1 at 24:14-18). This caused Barlow to cry, and she was consoled by a coworker. (Doc. 21-1 at 43:2-11). After she changed offices, Moseley frequently complained to her that he could not see her as often because of a nearby nosy coworker. (Doc. 21-1 at 17:20-18:1). This coworker claims that Moseley also sexually harassed her in the past. (Doc. 21-1 at 44:2-6). As a result of these incidents, Barlow's coworkers

began to warn her when Moseley was coming so she could make sure she was unavailable. (Doc. 21-1 at 39:5-14).

Piggly Wiggly had a sexual harassment policy and regularly distributed it to its employees. (Doc. 21-1 at 34:20-35:1). If an employee wished to complain of harassment, she was instructed to direct her complaint to any of Piggly Wiggly's vice presidents, including Moseley, or to the Director of Human Resources. (Doc. 21-1 at 22). In fact, Moseley was listed on a prominent poster as a harassment contact. (Doc. 21-3 at 21:12-22). While Barlow was aware of the policy, she did not report the prior incidents as harassment because Moseley often said that as long as he had a job, she had a job, and she perceived this as a threat. (Doc. 21-1 at 19:13-17).

On September 20, 2012, two days before Barlow's wedding, Moseley walked into Barlow's office and shut the door behind him. (Doc. 21-1 at 20:2-7). Moseley admits that he shut the door because he knew what he was about to do was wrong and did not want others to see it. (Doc. 21-2 at 27:18-28:3). He walked over to Barlow and said that he wanted to kiss the bride. (Doc. 21-2 at 20:1-4). Moseley pressed against her and attempted to pull her jaw upward toward him, so Barlow put her hands over her head to protect her face. (Doc. 21-1 at 20:12-13, 21:10-14). She resisted for about as long as she could. He eventually stopped and walked out. (Doc. 21-1 at 20:14-15). As he was leaving, he repeated that he was just going to give the bride a kiss. (Doc. 21-1 at 20:15-17).

3

Barlow wept in her office, then decided to report Moseley's actions. (Doc. 21-1 at 22:8-13). She met with David Bullard (the president of Piggly Wiggly), her supervisor, and a human resources representative and relayed the encounter. (Doc. 21-1 at 23:7-14). Bullard told her that Moseley's conduct would not be tolerated and would be taken care of. (Doc. 21-1 at 26:4-6). Bullard then met with Moseley, reprimanded him verbally, and instructed him to avoid all contact with Barlow. (Doc. 21-3 at 13:9-17). Bullard decided not to terminate Moseley because he was scheduled to retire in six months and had no prior issues, but Bullard told him that he would be terminated if any other incidents occurred. (Doc. 21-3 at 13:17-14:7). Moseley largely complied with Bullard's instructions until he retired in April 2013. (Doc. 21-1 at 30:16-32:16). Moseley now admits that his conduct violated Piggly Wiggly's sexual harassment policy. (Doc. 21-2 at 39:19-22).

Barlow filed a charge of discrimination with the EEOC on March 4, 2013, and received her right-to-sue letter on February 24, 2014. (Docs. 1-1, 1-2). She timely filed this action on May 23, 2014, alleging a Title VII hostile work environment claim against Piggly Wiggly and state-law claims of assault and battery, outrage, and invasion of privacy against both defendants. (Doc. 1). Defendants filed a motion for partial summary judgment, seeking dismissal of all claims against Piggly Wiggly and of the outrage claim against Moseley. Moseley does not seek dismissal of the assault and battery

or invasion of privacy claim.

**DISCUSSION**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "examine the evidence in the light most favorable to the non-moving party," drawing all inferences in favor of such party. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

**A. Sexually Hostile Work Environment**

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). The Supreme Court has found this prohibition to encompass certain sexual harassment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986). "There are two types of sexual harassment cases: (1) quid pro quo, which are 'based on threats which are carried out' or fulfilled, and (2) hostile environment, which are based on 'bothersome attentions or sexual remarks that are sufficiently

severe or pervasive to create a hostile work environment.'" *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998)), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In this action, Barlow only advances a hostile environment theory.

> To prove a hostile work environment claim, Barlow must show:
>
> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (quoting *Mendoza v. Borden*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)). Piggly Wiggly only contests Barlow's ability to show the final two prongs.

**1. Severity or Pervasiveness**

"The fourth element—that the conduct complained of was 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment'—is the element that tests the mettle of most sexual harassment claims." *Gupta*, 212 F.3d at 583. In order to prevent Title VII from inappropriately becoming a "general civility code," *Oncale v. Sundowner Offshore*

*Servs., Inc.*, 523 U.S. 75, 80 (1998), the Eleventh Circuit has required plaintiffs to establish, even at summary judgment, "a minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII," *Mendoza*, 195 F.3d at 1246. Courts should use motions for summary judgment to "police the baseline for hostile environment claims," *id.* at 1244 (quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n.8 (5th Cir. 1999)), but where exactly that baseline lies is not always obvious.

"Harassment is severe or pervasive for Title VII purposes only if it is both subjectively and objectively severe and pervasive." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000). The subjective component is routinely satisfied at the summary judgment stage, as it is here. *See Gupta*, 212 F.3d at 583; *Johnson*, 234 F.3d at 509. When evaluating the objective component, the Supreme Court has provided four non-exhaustive factors to consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. "The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the

7

terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Id.*

Given the severity of the September 20 incident and the pervasive nature of Moseley's other comments and visits, the court cannot find as a matter of law that Moseley's conduct was not severe or pervasive. Simply put, a jury should decide whether Moseley's conduct, which he admits was wrong and a violation of Piggly Wiggly's sexual harassment policy, was sufficiently severe or pervasive as to alter the terms and conditions of Barlow's work environment.

Arguing against this result, Piggly Wiggly primarily cites two Eleventh Circuit cases, *Mendoza* and *Gupta*, in which the court held that the harassment alleged was not severe or pervasive. Neither of those plaintiffs, however, alleged the forceful conduct present here. In *Mendoza*, the defendant allegedly followed the plaintiff around and stared at her, three times made sniffing noises in the direction of her crotch, rubbed his hip against hers while passing in a hallway, and made an arguably sexually laden comment when she confronted him about his conduct. 195 F.3d at 1242-43. The court found no actionable sexual harassment, but that case is quite different from this case. While the *Mendoza* court focused primarily on the ambiguous motive present in the defendant's touching and following of the plaintiff, Moseley's forceful attempted kiss of Barlow displays none of those ambiguities - Moseley admits that he

8

was trying to kiss Barlow and that his conduct violated the sexual harassment policy. Moreover, while the conduct in *Mendoza* was found to be physically non-threatening, the same cannot be said in this case, in light of Moseley's pushing and pulling at Barlow and her desperate attempt to defend herself. *Mendoza*, then, does not shield Piggly Wiggly.

Piggly Wiggly's reliance on *Gupta* is similarly unavailing. In broad terms, the plaintiff in that case complained of inappropriate comments and phone calls, staring, touching of jewelry during conversation, and touching of the plaintiff's knee and hem of her dress. 212 F.3d at 583-85. The court found this conduct insufficient primarily because its motivation was ambiguous. While the court conceded that the defendant should not have touched the plaintiff's knee and hem, because the touches were not "coupled with any verbal suggestions or advances," *id.* at 585, and because they occurred infrequently, the plaintiff did not present sufficient evidence of severity. As reasoned above, the severity in this case is much clearer.

This case is more like the Eleventh Circuit's decision in *Johnson* than *Mendoza* or *Gupta*. In *Johnson*, the plaintiff alleged that the defendant made frequent inappropriate comments, stared at the plaintiff, attempted to massage her, acted as if he was going to kiss her, inappropriately rubbed his body parts against her, and, after getting the plaintiff's attention, pulled up his pants

to reveal an imprint of his private parts. 234 F.3d at 506. The court found that the pants-pulling incident, unwanted massages, and touching of body parts were sufficiently severe that, when combined with the frequency of these and the defendant's comments, the defendant's conduct constituted actionable sexual harassment. Similarly, in this case, the frequency of Moseley's visits and comments and the severity of the forced kissing incident prevent this court from deciding as a matter of law that Moseley's conduct was not severe or pervasive. Whether Moseley's conduct crossed the baseline is a question of fact for a jury, not a question of law for the court.

### 2. A Basis for Holding Piggly Wiggly Liable

Piggly Wiggly next argues that it cannot be held liable for sexual harassment because it is shielded by what is known as the *Faragher* or *Ellerth* defense. In these two cases, the Supreme Court held that an employer is not vicariously liable for a hostile work environment created by a supervisor if "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

Barlow, however, correctly argues that the defense does not apply when the harassing supervisor is within the employer's upper

management. As the Eleventh Circuit noted in *Dees v. Johnson Control World Services, Inc.*, 168 F.3d 417, 422 (11th Cir. 1999), the *Faragher* defense only applies to one theory of vicarious liability - that "the supervisor is aided in committing the harassment by the existence of his agency relationship with the employer." The court held that an employer may still be vicariously liable, without regard to the defense, if "the supervisor holds such a high position in the company that he could be considered the employer's 'alter ego.'" *Id.* at 421-22. Accordingly, under the vicarious liability theory that Barlow advances, the *Faragher* defense is unavailable to Piggly Wiggly at the summary judgment stage.[2]

The question then becomes how high of a position is high enough for alter ego liability to attach. When addressing a slightly different question, the Eleventh Circuit in *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1279 (11th Cir. 2002), held that a manager's knowledge of a sexual harassment complaint could be imputed to the employer when the manager was separated in the corporate structure from the employer's president by only one

---

[2]The Supreme Court appears to have recognized this in *Faragher* and *Ellerth*, because in both cases the Court noted with approval that liability may attach, regardless of remedial action, in situations "where the agent's high rank in the company makes him or her the employer's alter ego." *Ellerth*, 524 U.S. at 758; *Faragher*, 524 U.S. at 789. This court is unprepared to find, as a matter of law, that Moseley was Piggly Wiggly's alter ego for the purposes of resolving this controversy.

person. In this case, of course, the connection is closer than that, as Moseley reported directly to Piggly Wiggly's president, with no one separating them in the corporate structure. Other circuits have centered the inquiry on whether the harasser held a "sufficiently high position in the management hierarchy." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 384 (5th Cir. 2003) (quoting *Faragher*, 524 U.S. at 789). The Tenth Circuit has held that a vice president who reported directly to the company's president qualified as an alter ego, *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1232-33 (10th Cir. 2000), and the Seventh Circuit has held the same for a corporate officer, *Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000). Because of Moseley's comparable role to the supervisors in *Miller*, *Mallinson-Montague*, and *Johnson*, the court finds that it as a jury issue as to whether Moseley acted as Piggly Wiggly's alter ego, so that his conduct and knowledge are imputed to the company. Piggly Wiggly can succeed with its *Faragher* defense only if Barlow fails to prove that Moseley was Piggly Wiggly's alter ego.

## B. Outrage

Alabama courts first recognized the tort of outrage, otherwise known as intentional infliction of emotional distress, in *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980). The court held that "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is

12

subject to liability for such emotional distress and for bodily harm resulting from that distress." *Id.* at 365. The court emphasized that, in order to be actionable, the conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* The resultant emotional distress "must be so severe that no reasonable person could be expected to endure it." *Id.*

Unsurprisingly, the Alabama Supreme Court "has consistently held that the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993). Nonetheless, the court has recognized the tort in cases "involving egregious sexual harassment." *Id.* As with Title VII cases, the line separating egregious sexual harassment from non-actionable conduct is not entirely clear. In *Busby v. Truswal Systems Corp.*, 551 So. 2d 322 (Ala. 1989), the Alabama Supreme Court reversed a grant of summary judgment on the plaintiffs' outrage claim. In that case, the plaintiffs submitted evidence that the supervisor made many sexually inappropriate comments, "acted as if he was going to pinch one plaintiff's breasts with a pair of pliers and with his hands," attempted to follow one plaintiff into the restroom, followed a plaintiff home, stared at the plaintiffs, and put his arm around the plaintiffs while grabbing their arms and stroking their necks.

*Id.* at 324. In *Harrelson v. R.J.*, 882 So. 2d 317 (Ala. 2003), the court found that the defendant's sexual assault of a minor constituted outrage.

In *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 650-51 (Ala. 1986), however, the court found no allegations sufficient to support a claim for outrage when the defendant propositioned an affair multiple times, attempted to kiss the plaintiff, looked at the plaintiff inappropriately, and touched the plaintiff's arm and put his arm around her. Similarly, in *Turner v. Hayes*, 719 So. 2d 1184 (Ala. Civ. App. 1997), *reversed on other grounds by Ex parte Atmore Community Hospital*, 719 So. 2d 1190 (Ala. 1998), the Court of Civil Appeals affirmed the dismissal of the plaintiff's outrage claim. In that case, the plaintiff presented evidence that the defendant fondled his genitals in plaintiff's presence, poked plaintiff and other females near their breasts, touched plaintiff's waist and rubbed against her while passing in a doorway, touched her leg, tried to look up her skirt, and made several sexually inappropriate comments and propositioned her. *Id.* at 1187.

Alabama federal courts have often had occasion to decide outrage claims, and Judge Propst has ably noted the lines frequently drawn:

> Mere requests for sexual favors are not sufficient. Nor are demands which, if refused, carry a consequence of economic loss or loss of status at employment sufficient. However, when the sexual impositions are not merely verbal or economic, but become physical impositions, the harasser is no longer attempting to request sexual favors

```
(in exchange for job security), but is instead attempting
to force sexual liberties. An employee can decline even
the most obscene request to be touched in a sexual
manner. An employee cannot decline a physical act that
has already occurred. At that point, the harasser's
conduct goes beyond the simply base and oversteps the
tolerable bounds of a civilized society.
```

*Brewer v. Petroleum Suppliers, Inc.*, 946 F. Supp. 926, 936 (N.D. Ala. 1996) (citations omitted).

The court finds that Barlow's outrage claim, just as her Title VII claim, should be decided by a jury. Judge Propst was correct to note that "attempting to force sexual liberties" is actionable conduct, and that is what is alleged here. Defendants' cited cases are not to the contrary, because the forced sexual contact present in this case is lacking in those cases. In *McIsaac* and *Turner*, for instance, while the plaintiffs complained of unwanted touching, the intent behind the touching was not as clear as in this case - while poking near a plaintiff's breasts, contact in a doorway, putting an arm around a plaintiff, and touching a plaintiff's arm or leg can certainly be offensive, that type of contact does not rise to the level of the forceful attempted kiss in this case. The same is true of the contact in cases such as *Saville v. Houston County Healthcare Authority*, 852 F. Supp. 1512 (M.D. Ala. 1994), *Durham v. Philippou*, 968 F. Supp. 648 (M.D. Ala. 1997), and *Burden v. International Longshoremen's Association*, 510 F. Supp. 2d 618 (S.D. Ala. 2007). The ambiguous motivation and/or less severe contact in those cases separates them from this case.

The court finds this case much more similar to *Mills v. Wex-Tex Industries, Inc.*, 991 F. Supp. 1370 (M.D. Ala. 1997). In *Mills*, the defendant pinned plaintiff against a wall and tried to kiss her, grabbed her breasts and buttocks, pinched her, tried to pull her into his office, and made inappropriate comments. *Id.* at 1386. The court there found that the unambiguous, inappropriate touchings created a jury question, and this court will do the same. Accordingly, the court will deny summary judgment on Barlow's outrage claim.[3]

## C. Piggly Wiggly's Liability on State-Law Claims

Finally, Piggly Wiggly contends that it cannot be held liable for any of Barlow's state-law claims. Under Alabama law, an employer may be held either directly or vicariously liable for an intentional tort committed by an employee. *Potts v. BE & K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992). An employer may not be held vicariously liable, however, for sexual harassment by an employee when the employee acts only to "satisf[y] his own lustful desires," as is the case here. *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194-95 (Ala. 1998). Piggly Wiggly, then, may only be held liable under a direct liability theory. "The employer is directly liable for its own conduct if it authorizes or participates in the

---

[3]Defendants do not contest the severity of Barlow's emotional distress, but regardless Barlow has presented sufficient evidence to allow a jury to decide whether the requisite severity is present. (Doc. 21-1 at 48:4-53:23).

employee's acts or ratifies the employee's conduct after it learns of the action." *Potts*, 904 So. 2d at 400. "An employer ratifies conduct if: (1) the employer has actual knowledge of the tortious conduct; (2) based on this knowledge, the employer knew the conduct constituted a tort; and (3) the employer failed to take adequate steps to remedy the situation." *Atmore Cmty. Hosp.*, 719 So. 2d at 1195.

 Barlow does not dispute that, unless Moseley's knowledge and actions may be imputed directly to Piggly Wiggly, Piggly Wiggly did not authorize, participate in, or ratify Moseley's conduct because it took prompt corrective action as soon as Bullard learned of Barlow's complaint. Barlow only contends that Moseley's knowledge and conduct, by virtue of his position within Piggly Wiggly, should be imputed to Piggly Wiggly and support the company's direct liability, just as for her Title VII claim.

 While Alabama courts have not squarely addressed the question, the court is persuaded by Barlow's position. Moseley, as one of only three executive vice presidents, reported directly to the president and was a corporate officer. He was one of the primary contacts involved in resolving sexual harassment complaints. Because a corporation can only know things and act through its people, and because Moseley's position within Piggly Wiggly is clearly high enough to potentially impute alter ego liability for a very similar Title VII cause of action, the court finds that

Moseley, even for state-law purposes, arguably acted as Piggly Wiggly's alter ego. At this stage, Piggly Wiggly may therefore fairly be held responsible for participation in and ratification of Moseley's conduct, making the company potentially liable under Alabama law.

## CONCLUSION

For the reasons stated above, defendants' motion for partial summary judgment (Doc. 19) is DENIED.

Perhaps the question of a possible conflict-of-interest in the representation of both defendants by the same law firm should have been addressed and resolved sooner, but it must be dealt with before trial. Accordingly the court will conduct a status conference **at 10:30 AM on October 27, 2015,** in chambers. Louia Moseley shall be present in person. A court reporter shall likewise be present.

DONE this 2nd day of October, 2015.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE